UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH SHOLLENBERGER,<br><br>                    Plaintiff,<br><br>     – against –<br><br>NEW YORK STATE UNIFIED COURT SYSTEM,<br>JANET DIFIORE in her individual capacity and in her official capacity as the Chief Judge of the State of New York, and<br>LAWRENCE K. MARKS in his individual capacity and in his official capacity as the Chief Administrator of the New York State Unified Court System,<br><br>                    Defendants. | 18 CV 9736<br><br><br><br><br>COMPLAINT |

Plaintiff Elizabeth Shollenberger, by her attorneys, Cary Kane LLP, complains of Defendants as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this action to remedy discrimination in the terms and conditions of her employment because of her disabilities and perceived disabilities, retaliation for engaging in protected activity, and interference with her exercise and enjoyment of her legal rights as a disabled person.  More specifically, Plaintiff complains that Defendants discriminated against her (including by retaliation and/or interference) by repeatedly failing to provide reasonable accommodations for her known disabilities; repeatedly failing to engage in an interactive process to determine the feasibility of such accommodations; creating, tolerating, and aiding and abetting a hostile work environment and the harassment of her on account of her disabilities and perceived disabilities; making adverse employment actions, including twice suspending her from performing

1

her judicial duties on account of her disabilities and perceived disabilities, without legitimate cause; treating her differently, and adversely, in a number of respects from other non-disabled and differently disabled judges; and, for the purpose of prolonging their illegal suspension of her and interfering with her exercise of her legal rights as a disabled person, repeatedly making unwarranted and intrusive demands for medical examinations and personal medical information that were disproportionate to Defendants' legitimate needs for Plaintiffs' medical information.

2.      Plaintiff seeks declaratory and injunctive relief, pursuant to the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 *et seq*. ("ADA"); section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 ("Rehab Act"); and the New York Human Rights Law, Executive Law §§ 290 *et seq.* ("NYSHRL") against Defendant New York State Unified Court System ("Court System") and against the individual Defendants Chief Judge Janet DiFiore and Chief Administrative Judge Lawrence K. Marks in their individual and official capacities; monetary damages for pain and suffering and reputational and professional harm against the Court System pursuant to the Rehab Act and against Chief Judge DiFiore and Chief Administrative Judge Marks in their individual capacities pursuant to the NYSHRL; Plaintiff's reasonable attorneys' fees and costs incurred in pursuing this relief, against the Court System pursuant to the ADA and Rehab Act and against Chief Judge DiFiore and Chief Administrative Judge Marks in their individual capacities pursuant to the NYSHRL; and all other appropriate legal and equitable relief.

## JURISDICTION AND VENUE

3.      The Court has federal subject-matter jurisdiction over Plaintiff's ADA, and Rehab Act claims pursuant to 42 U.S.C. §§ 1331, 12117(a), and 29 U.S.C. § 794a(a)(2).

4.      The Court has supplemental jurisdiction over Plaintiff's NYSHRL claims pursuant to 42 U.S.C. § 1367(a) because they form part of the same case and controversy with Plaintiff's federal claims.

5.      Venue is proper within this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred here.

6.      Assignment of this case to the White Plains Courthouse is proper pursuant to Rule 18(a)(i) of the Local Rules for the Division of Business Among District Judges because the claims arose in whole or major part in Westchester County and Plaintiff resides in Westchester County.

## PARTIES

7.      Plaintiff Judge Elizabeth Shollenberger is an individual who resides in the County of Westchester, State of New York.  She is a City Court Judge in the White Plains City Court.  She was appointed to this position by the Common Council of White Plains. In this position, Plaintiff is an employee of the State of New York, and of Defendants, pursuant to New York Judiciary Law § 39(6) and the New York State Constitution.

8.      Defendant Court System is an arm of the State of New York, and the judicial branch of its government, established pursuant to Article VI of the New York State Constitution.  It has accepted federal funding and thus has consented to suit under the Rehab Act.  The Court System is Plaintiff's employer; it has directed her in the

performance of her duties and freely exercised its power to prevent her from performing any or all of her duties in its sole determination.

9.     Defendant Chief Judge Janet DiFiore ("Chief Judge DiFiore") is the Chief Judge of the State of New York.  She is responsible for the standards and administrative policies of the New York courts and is the chairperson of the administrative board of the courts.  She oversees the Court System's administration and has power to direct all administrative operations, including all personnel matters pertaining to Plaintiff's employment.  Chief Judge DiFiore has served in this position since January 2016 and at all times relevant to this action.  The Chief Judge is Plaintiff's employer for purposes of Plaintiff's NYSHRL claims because she has the power to do more than carry out personnel decisions made by others.

10.     Defendant Chief Administrative Judge Lawrence K. Marks ("Judge Marks") is the Chief Administrative Judge and Chief Administrator of the Courts.  He has served in this position since July 2015 and at all times relevant to this action.  In this capacity, he serves at the pleasure of the Chief Judge, and is responsible for supervising and directing the administration and operation of the Court System, including all personnel matters pertaining to Plaintiff's employment.  He directs the administration and operation of the Court System through the Office of Court Administration ("OCA") and other offices within the Court System.  Among other things, the Chief Administrator is responsible for assigning judges to the courts.  As the Chief Administrator, Judge Marks is responsible for making inquiry to determine the fitness of any judge who has been unable to fully perform her duties for a period of greater than 60 days, upon receiving a notice of referral from the administrative judge having jurisdiction over the court in

which such a judge is assigned to sit.  As the Chief Administrator, Judge Marks may direct medical examinations of a judge who has been unable to fully perform her duties for an extended period, after consultation with the Presiding Justice of the appropriate Appellate Division.  *See* 22 New York Codes, Rules and Regulations § 113 ("Part 113"). As the Chief Administrator, Judge Marks is Plaintiff's employer for purposes of Plaintiff's NYSHRL claims because he has the power to do more than carry out personnel decisions made by others.

## SATISFACTION OF ADMINISTRATIVE REQUIREMENTS

11.     On December 20, 2017, Plaintiff filed a Charge of Discrimination with the New York District office of the Equal Employment Opportunity Commission ("EEOC"), together with a sworn affidavit, alleging claims of disability discrimination and continuing violation under the ADA and Rehab Act.

12.     On April 2, 2018, Plaintiff filed a supplemental sworn affidavit with the EEOC to supplement her Charge with additional actionable allegations of events that occurred after she filed the original Charge.

13.     On July 27, 2018, after receiving the Charge from the EEOC, the Department of Justice, Civil Rights Division issued a Notice of Right to Sue Within 90 Days to Plaintiff.

14.     The events complained of herein that occurred after April 2, 2018 are reasonably related to the allegations made in Plaintiff's December 20, 2017 and April 2, 2018 affidavits filed with the EEOC, because they were carried out in precisely the same manner alleged in the EEOC charge, are part of the continuing wrong that Plaintiff

alleged in her December 20, 2017 EEOC Charge, and/or constitute retaliation against Plaintiff for filing her EEOC Charge.

## FACTUAL ALLEGATIONS

### Background

15.     Plaintiff graduated from Yale Law School in 1981 and was admitted to the New York bar (First Department) in 1982.  She worked as an attorney for the next 35 years, including several years in private practice, two years as a full-time instructor at New York University Law School, and 21 years in legal services representing underprivileged and vulnerable individuals.  From 1992 to 1999, Plaintiff supervised the tenant unit at Bronx Legal Services; from 1999 to 2003, she supervised the elderly unit at Bronx Legal Services; and from 2003 to 2009, she supervised the public benefits unit at Queens Legal Services.  Plaintiff has remained an attorney in good standing throughout her law career.  In addition to working as a lawyer, she has served her community in various elected or appointed positions.  She was elected as a Democratic District Leader in Greenwich Village, where she served from 1986 to 1995; she was appointed to Community Board #2 in Manhattan, where she sat from 1986 through 1996; and she served as the Chair of the White Plains Democratic City Committee, from 2003 until the end of 2016.  All of these were unpaid positions.

16.     In 1996, she was a candidate for Civil Court in Manhattan, at which time her credentials were reviewed, and she was found qualified by the Association of the Bar of the City of New York (now renamed the New York City Bar Association), although ultimately, she was not elected by the voters to that position.

17.     On or about December 20, 2016, the Common Council of the City of White Plains appointed Plaintiff to the position of City Court Judge.  Plaintiff is one of four White Plains City Court Judges appointed to serve in the White Plains City Court ("WPCC"), which is part of the Ninth Judicial District of the Court System.  Plaintiff was sworn into the position on January 3, 2017 by the Mayor of White Plains.  This is Plaintiff's first judgeship.  Her appointment is for ten years.

18.     As City Court Judge, Plaintiff presides over traffic court hearings, small-claims court cases involving claims up to $5,000, landlord-tenant and other housing cases, other civil cases involving claims up to $15,000, criminal arraignments of felonies (including weekend and evening arraignments), and criminal trials of misdemeanors.

19.     In December 2016, immediately after receiving the news of her appointment to the judgeship, Plaintiff closed her law practice, resigned her position with the Democratic City Committee, and began the work of notifying the clients of her law practice, changing her attorney contact information, disbanding her office lease, and similar matters.

20.     In accepting the judgeship, Plaintiff was required to retire from the practice of law.  Accordingly, she gave up her 35-year career as attorney.  Plaintiff embraced her new role as judge with eagerness and commitment.

21.     Plaintiff's medical conditions qualify as disabilities within the meaning of the ADA, Rehab Act, and NYSHRL.  Most of her disabilities are apparent to others and at all relevant times were known to Defendants.  Plaintiff is diagnosed with the following medical conditions:  (i) Pulmonary hypertension, which is a condition that features high blood pressure in the lungs, and was diagnosed in or around 2006 when Plaintiff was

about 50 years old; (ii) Chronic obstructive pulmonary disease ("COPD"), diagnosed in 2012; (iii) Immune thrombocytopenia ("ITP"), diagnosed in 2007; (iv) Lymphedema in her legs, resulting from an accident that occurred in 1989 when she fell into the gap between the subway platform and the train in the Union Square subway station in New York City, when Plaintiff was 33 years old; (v) Fungal infection in Plaintiff's left lower leg, resulting from the same 1989 accident; (vi) Lack of strength in her legs due to the same accident; and (vii) Obesity.

22.     Plaintiff is and was at all relevant times qualified to perform the essential functions of her job, with or without reasonable accommodations that would not impose an undue hardship on Defendants.

23.     Plaintiff's COPD and pulmonary hypertension require her to use a walker or motorized scooter to get around, and to carry with her a small and quiet oxygen concentrator, which most of the time is switched on to deliver oxygen to her nose through a thin, lightweight transparent tube.  Even with the assistance of an oxygen concentrator and walker, Plaintiff walks slowly and must stop to rest momentarily every 30 feet or so.

24.     ITP is defined as isolated low platelet count with normal bone marrow and the absence of other obvious causes.  ITP is an immune deficiency that at times restricts the production of platelets, and thus prevents proper blood clotting.  When Plaintiff's platelet count is low, she experiences an increased tendency to bleed, spontaneous and deep bruising, and wounds that resist healing.

25.     Plaintiff takes prescribed medications, including antibiotics and antifungal drugs when she has an active infection.  These medications frequently cause stress to

Plaintiff's gastrointestinal system, requiring her to have quick access to the restroom. Since May 2017, Plaintiff wears incontinence pads continuously when she is not at home.

26.     Obesity is partly a result of Plaintiff's other medical conditions and the accident she suffered in 1989.  People are quick to judge, and obesity is one of the "last frontiers" where many people still feel empowered to discriminate.  As explained below, the employees of the Court System used the taint of "obesity" when they spoke with the press in order to stigmatize Plaintiff and tarnish her reputation.

27.     Plaintiff's pulmonary hypertension, COPD, ITP, lymphedema, fungal infection, weak legs, and obesity substantially limit her major life activities.

28.     For the purposes of Plaintiff's NYSHRL claims, these conditions are clinically diagnosed medical impairments that prevent Plaintiff's exercise of normal bodily functions.

**Summary of This Lawsuit**

29.     Chief Administrative Judge Marks authorized two suspensions of Plaintiff from performing her judicial duties and from entering WPCC in her judicial capacity. The first suspension was in effect for some 14½ months, from May 2, 2017 to July 15, 2018.  The second suspension was ordered on August 15, 2018, just one month after she had returned to the bench from the first suspension and is currently in effect at the time of the filing of this Complaint.  Judge Marks's alleged justifications for these two suspensions were based on medical and public safety grounds.  However, these justifications were merely a pretext for the blatant efforts by the Court System and its employees to stigmatize, embarrass, and humiliate Plaintiff in her workplace, to make her work environment intolerable, to taint her reputation in the news media, and to get rid of Plaintiff permanently from the workplace, because of her disabilities and perceived

disabilities.  Upon information and belief, Judge Marks did not conduct any meaningful investigation of the employees' alleged complaints before suspending Plaintiff on either occasion, and either ignored or failed to seek input from Plaintiff's direct supervisors, the administrative judges having jurisdiction over WPCC in May 2017 and August 2018, respectively.

30.     At the time of the first suspension in May 2017, Judge Alan D. Scheinkman was the Administrative Judge of the Ninth Judicial District, with jurisdiction over WPCC, and Plaintiff's direct supervisor.  At the time of the second suspension in August 2018, Judge Kathie E. Davidson was the Administrative Judge of the Ninth Judicial District, having taken over the position from Judge Scheinkman in February 2018.

31.     Neither Judge Marks nor his deputies had a single conversation with Plaintiff about any concerns before either of Judge Marks's two suspensions of Plaintiff.

32.     Judge Marks and his deputies also did not direct Plaintiff's direct supervisor, or any other Court System official, to have a conversation with Plaintiff about any concerns before Judge Marks made his first suspension of Plaintiff on May 2, 2017. As explained below, Judge Scheinkman indicated to Plaintiff that Judge Marks made this suspension without Judge Scheinkman's involvement.

33.     Upon information and belief, Judge Marks or another Court official directed Judge Davidson to have a conversation with Plaintiff before Judge Marks made his decision to suspend Plaintiff a second time.  However, the conversation with Judge Davidson was not scheduled in advance, and it occurred on the morning of August 15, 2018, just a few hours before Judge Marks made his second suspension of Plaintiff.  As

detailed below, the conversation with Judge Davidson did not establish any grounds for suspending Plaintiff, but, on the contrary, established that the Court System had failed to provide the accommodation of Plaintiff's disability that it had agreed to provide.

34.     On both occasions, the precipitateness of Judge Marks's actions to suspend Plaintiff revealed the lack of any legitimate grounds for those actions.

35.     Upon information and belief, on both occasions, Judge Marks was aware that the employees' demands that Plaintiff be removed from the courthouse were motivated by irrational phobia, stigmatization, and illegal discrimination.  As such, Judge Marks's suspensions of Plaintiff were made in bad faith, in abuse of the trust of the City of White Plains and the public of New York State, and in egregious violation of federal and state laws.

36.     Judge Marks's suspensions of Plaintiff were made in tandem with other illegal acts of discrimination described herein.  For example, Defendants made new demands for medical examinations and certifications every time Plaintiff satisfied the previous ones, repeatedly moving the goalpost of Plaintiff's return to work away from her.  Upon information and belief, Defendants hoped that their suspensions of Plaintiff would change the facts on the ground to get rid of Plaintiff permanently; they believed that they could out-wait Plaintiff until she would give up trying to enforce her right to perform her appointed judicial duties, or until she would simply get sick and die.

37.     Plaintiff has been mindful of the dignity of the judiciary throughout these events, even when, as set forth below, she has been viciously attacked in the press by the employees of the Court System, and for that reason Plaintiff has refrained from responding to such attacks publicly.  After a year and a half of unsuccessful attempts to

resolve these matters through private negotiation and with the assistance of the EEOC,

Plaintiff now takes the step of initiating this litigation, believing that holding the Court

System and its chief officers accountable for their knowing, deliberate discrimination,

retaliation, and interference is the only way to preserve the dignity of the judiciary and

public confidence in the Court System.

38.    In pursuing her legal claims, Plaintiff is acting and speaking as an

employee to protect her own interests, including her professional reputation and judicial

career, which have been irreparably harmed by Defendants' and their employees' actions.

In addition, Plaintiff pursues these claims to ensure that she is permitted to perform the

judicial service to the City of White Plains that she was selected and appointed to

perform.

**DiFiore's Liability**

39.    Chief Judge DiFiore has absolute power to review and direct Judge

Marks's decisions and actions, and to correct any wrongdoing by Judge Marks and other

Court System employees pertaining to personnel matters involving New York State

judges.

40.    On November 24, 2017, one week after giving notice to the Court

System's attorneys pursuant to Rule 4.2(c) of the New York Rules of Professional

Conduct, Plaintiff wrote to Chief Judge DiFiore, detailing the injustice and illegalities of

her first suspension and other discriminatory treatment by Judge Marks and the Court

System, and asking Chief Judge DiFiore to intervene and correct these discriminatory

acts and continuing violations.

41.    Chief Judge DiFiore declined to intervene, and she instructed the Court

System's attorneys to convey that message to Plaintiff, which was done in a letter dated

November 29, 2017.  Chief Judge DiFiore thus endorsed and ratified all the wrongdoing

and continuing violations described in this Complaint in dereliction of her duties to

oversee and uphold the rule of law in the Court System's administration of these matters.

**Plaintiff's First Months at WPCC (January 3, 2017 – May 2, 2017)**

42.     After being appointed to the judgeship at the end of December 2016,

Plaintiff was sworn in and attended judicial training in the first week of January 2017.

From January 3 through May 2, 2017, Plaintiff worked 52 days and was out sick 36 days,

due to three hospitalizations, once for a leg wound infection and twice for pneumonia.

43.     Plaintiff's first day at WPCC was January 10, 2017.  On that day, Plaintiff

met with Eileen Byrne, the Chief Clerk of WPCC ("Byrne"), to go over procedures,

obtain a parking spot, select an office for her judicial chambers, and examine

handicapped access to the courthouse and to the judge's seat in each of the three

courtrooms.  Plaintiff explained to Byrne that she selected her judicial chambers based on

its close proximity to the judges' restroom and her ability to access it quickly.  At

Plaintiff's request, Byrne agreed to ask for railings to be installed at the steps up to the

judge's seat in two of the three courtrooms (Courtrooms A and B); the judge's seat in the

third courtroom (Courtroom C) was accessible for Plaintiff and needed no modification.

44.     Despite repeated follow-up conversations initiated by Plaintiff, no railings

were installed in the two courtrooms until approximately the end of March or early April

2017.  When just one railing was installed in each courtroom, it was clear that a second

railing (one on each side of the steps) would be required for Plaintiff to easily access the

judge's seat.  In April 2017, Plaintiff requested installation of the second railings in the

two courtrooms.  Nevertheless, Plaintiff was able to climb the steps to the judge's seat

with no railing, or one railing, most of the time during these months; she took care to

arrive in the courtroom early, before the litigants, so that her approach to the judge's seat would not be disruptive or distracting to the litigants.

45.     Upon information and belief, the delay in installing the first set of railings until late March or early April 2017 reflected Defendants' unwillingness to grant the reasonable accommodation that Plaintiff requested for her disabilities.  The second set of railings was not installed until July 2018; upon information and belief, that delay reflects the same unwillingness or hope that Plaintiff would simply go away.

46.     Plaintiff used the judges' restroom without problem at the start of her judgeship.  However, after a few weeks, the employees began locking the door of the judges' restroom and refusing to unlock the door for Plaintiff to use the restroom when she asked.  Upon information and belief, despite its designation as a judges-only restroom, this restroom was used by only one judge other than Plaintiff, Judge Jo Ann Friia, the senior judge at WPCC ("Judge Friia"); it was also used by Byrne and by Karen Carbone, the judges' secretary, and by one or two other female clerks.

47.     Byrne unreasonably refused to give Plaintiff her own key to the judges' restroom.  Byrne gave a large number of excuses to Plaintiff for why she did not want Plaintiff to use the judges' restroom.  First, Byrne said she did not have an extra key to give to Plaintiff.  Then, she said the restroom was not equipped with handrails.  Plaintiff explained that she did not need handrails to use that restroom.  Next, Byrne said there was a safety hazard, because Plaintiff left her walker in the hallway while using the judges' restroom.  Plaintiff questioned this, explaining that the walker is small and the hallway is amply wide.  Finally, Byrne said there was a safety hazard for Plaintiff when using the restroom, because the restroom locks from the inside, and there would be no

way for someone to open the door from outside if necessary.  Plaintiff told Byrne that this was of no concern, because Plaintiff's disabilities were not such as to make her likely to have any kind of problem while in the restroom, and she was just as safe in the restroom as any non-disabled judge or employee who uses it and should not be treated differently from them because of her disability or perceived disability.  Plaintiff also offered to hire a locksmith to change the lock mechanism and install a lock that could be opened from the outside, and provide multiple keys.  Byrne said, "No, that's impossible," but refused to explain why she thought it was impossible.

48.     Plaintiff sought the intervention of Judge Friia, as the senior judge.  Judge Friia declined to intervene.

49.     Byrne's and the other courthouse employees' actions to prevent Plaintiff from using the restroom that was most accessible to her constitutes a failure, ratified and condoned by Defendants, to grant Plaintiff her requested reasonable accommodation. Those actions intimidated and humiliated Plaintiff and made the workplace intolerable; upon information and belief, that was Byrne's and the other courthouse employees' intention.

50.     Byrne instructed Plaintiff to use the restroom located off the jury deliberation room and, without consulting Plaintiff, had handrails installed in that restroom.  Plaintiff objected to using that restroom because it was a long walk from her chambers and from Courtrooms A and B, and she could not reach it quickly when necessary.  Plaintiff also objected because the jury restroom is not private or discreet. The door to the restroom is in a small conference room where drug treatment court meetings and other confidential special court conferences are held.  It was intimidating

and humiliating for Plaintiff to have to walk slowly using her walker right through the middle of these private meetings with a dozen or so attendees before and after using the restroom, squeezing between the attendees' seats and the wall of the conference room to reach the restroom.  Also, everything in the restroom is easily audible in the conference room, and vice versa.  However, Plaintiff's objections were ignored and rejected by Byrne.  This situation created an intolerable workplace; upon information and belief, that was Byrne's intention.

51.    After her hospitalization for pneumonia, Plaintiff returned to work on April 10, 2017, and was not strong enough at that point to climb the steps to the judge's seat without a handrail on both sides.  She asked the court officers to give her a hand to lean on while she used the single handrail to get up the steps.  The officers had earlier given her a hand before any handrail was installed, but now they refused.  Byrne claimed that it would violate the union contracts for the courthouse employees to assist Plaintiff in any way, even by giving her a hand to lean on.  However, Byrne did not cite any provision of the union contracts that would support this assertion.

52.    During the coming year and a half, Defendants continued to invoke the union contracts as the justification for why a helping hand could not be offered to Plaintiff.  When challenged on this point, Defendants did not cite any provision of the union contracts that would support this assertion.

53.    Upon information and belief, there is no such provision in the union contracts or collective bargaining agreements.  According to several reports, the late Judge Barbara Leak ("Judge Leak") regularly received a helping hand from court officers

at WPCC to get up the steps to the judge's seat.  (Plaintiff was appointed to fill Judge

Leak's open judgeship following her retirement.)

54.     For some reason, Plaintiff's disabilities elicited a hostility and animus that

Judge Leak's disabilities did not.  Upon information and belief, Defendants' unsupported

reference to the union contracts was a pretext for discrimination against Plaintiff because

of her particular disabilities, and was intended to, and did, create an intolerable workplace

for Plaintiff in which she was demeaned, humiliated, and intimidated.  It also provided a

"cover" for Defendants to deny Plaintiff the reasonable accommodation she requested of

a helping hand to get up the three steps to the judge's seat.

55.     Since Plaintiff was not strong enough to climb the steps to the judge's

seat, and since she was denied a helping hand, she proposed yet another reasonable

accommodation:  that she preside over the courtroom from a table on the floor level on

days when she was unable to climb to the bench.  The courthouse employees balked at

this and denied her request.  However, one of the employees subsequently told Plaintiff

that the Administrative Judge (Judge Scheinkman) had intervened and instructed WPCC

personnel to set up a table on the floor level in each courtroom for Plaintiff to use when

presiding over court hearings and calendars.  The employees carried out Judge

Scheinkman's instruction, and the arrangement worked well.  Nevertheless, the

courthouse employees continued to complain about it and raise objections and generally

harass Plaintiff about her conducting court from the floor level rather than from the

judge's elevated seat.

56.     Plaintiff was hospitalized from February 3 to 13, 2017 with a leg infection.

When Plaintiff returned to work, the antibiotics that she was taking for the infection

stressed Plaintiff's gastrointestinal system.  There was a day in the second half of

February when Plaintiff was caught off-guard at the end of the day in her chambers.  At

around 5:15 p.m. (just before the courthouse is closed and the court officers leave at

5:30), she urgently needed to use the restroom.  The judges' restroom was locked, and

Plaintiff could not find anyone to open it for her.  She made her way slowly down to the

restroom in the jury deliberation room, and made it into the restroom in time, but

unfortunately defecated on the floor of the restroom before reaching the toilet.  She

attempted to clean it up, but there were no paper towels in the dispenser, so she used

toilet paper, which was ineffective.  She found a courthouse employee and asked for a

mop so that she could finish cleaning it up.  The employee told Plaintiff to leave it for the

cleaning crew to deal with, so Plaintiff put a sign on the restroom door that read "please

do not enter, except for cleaning crew" or words to that effect.

57.     After this incident, no one from the courthouse or the Court System sought

to discuss the incident with Plaintiff or told her that it presented a concern.  On her own

initiative, without discussion, Plaintiff began wearing incontinence pads whenever she

was experiencing gastrointestinal stress, in order to avoid a repeat of this incident.

**Incident of May 1, 2017**

58.     Despite her efforts, Plaintiff was caught off-guard again at the end of the

day on May 1, 2017, at a time when she was not experiencing gastrointestinal stress and

therefore was not wearing an incontinence pad.  After the end of the afternoon court

session that Plaintiff presided over in courtroom C on May 1, the court clerk and officer

exited the courtroom, and left Plaintiff alone in the courtroom with the doors locked so

that no one could enter from the outside.  The courtroom is windowless, and there was no

visibility into the courtroom.  Plaintiff suddenly and urgently needed to use the restroom

and knew she would not be able to make it to the jury room restroom in time.  In distress, she defecated in a plastic-lined wastepaper basket.  She then removed and tied the plastic liner bag and double-bagged it for disposal, but a small stain about the size of a quarter was visible on the carpet.  Plaintiff went to tell the courthouse employee on duty that she had a bathroom accident and there was a small stain on the carpet of the courtroom that needed to be cleaned.  The employee made no reply, and just stared with open hostility at Plaintiff.

59.    This May 1 incident set in motion a hysterical reaction by the courthouse employees and the Court System that had no scientific, medical, or other rational basis. Upon information and belief, the courthouse employees intended to humiliate Plaintiff, and Judge Marks caved in to pressure from the employees to suspend Plaintiff from performing her judicial duties and appearing in the courthouse.

60.    No one from the courthouse or the Court System asked Plaintiff what happened in the May 1 incident at any time before, during, or after the reactionary events described in the following paragraphs.  No one sought to discuss with Plaintiff how she could avoid such an incident.  On her own initiative, without discussion, Plaintiff began wearing incontinence pads not only when experiencing gastrointestinal distress but whenever she left her home, to avoid any repeat of the incident.

61.    First, on the afternoon of May 1, courthouse employees mounted yellow police tape to cordon off both entrances to Courtroom C.  The yellow police cordon remained in place throughout the day on May 2.  Upon information and belief, the yellow police cordon was intended to draw unnecessary attention and to signal to all employees and the members of the public with business in the courthouse that Plaintiff's courtroom

was some sort of crime scene or the site of some horrendous health hazard.   Upon
information and belief, the mounting of the cordon by courthouse employees was
emboldened or encouraged by the hostile environment that Byrne created and tolerated
against Plaintiff at WPCC.  The cordon humiliated and intimidated Plaintiff and upon
information and belief was intended to do so.

62.    On the morning of May 2, because Part C was cordoned off, Byrne
instructed Plaintiff to conduct the Part C traffic hearings from the Civil Part courtroom,
and to wait to do so until after the Civil Part finished its calendar.

63.    This meant that the Part C traffic court litigants had to wait aimlessly
around the courthouse until the later part of the morning, at inconvenience to themselves
and others.

64.    When Plaintiff finally began conducting her morning Part C court
hearings, the clerk who was assisting her that day was wearing bright yellow rubber
gloves such as those used for dishwashing.  This had never happened before.  Plaintiff
asked the clerk why she was wearing the gloves, and the clerk replied, "For my health."
Again, this drew unnecessary attention to Plaintiff and, upon information and belief, was
intended to signal to the members of the public with business in the courtroom that there
was something gravely wrong with Plaintiff.

65.    Plaintiff's health conditions are not contagious, and no reasonable person
could reasonably expect that handing court files or papers to Plaintiff or receiving them
from her would put him or her in contact with any objectionable or contagious matter.
Upon information and belief, this employee's stigmatizing conduct was emboldened or
encouraged by the hostile environment that Byrne created and tolerated against Plaintiff

at WPCC.  The employee's wearing of these gloves humiliated and intimidated Plaintiff and made the workplace intolerable.

66.     Byrne instructed Plaintiff to conduct her afternoon court calendar in the Criminal Part courtroom.  Plaintiff asked Byrne to have the table moved from the ground level of the Civil Part courtroom so that she could use it in the Criminal Part courtroom. Byrne denied this request, telling Plaintiff that no one was authorized to move the table from the one courtroom to the other.  Plaintiff protested, saying that she believed that Judge Scheinkman had authorized it.  Byrne said, "It doesn't matter, you will just have to get up the steps in the other courtroom" or words to that effect.  Plaintiff did mount the steps, with great effort.

67.     Finally, on the afternoon of May 2, Plaintiff saw three people entering courtroom C wearing what appeared to be full hazmat (hazardous material) suits and breathing masks.  This took place within the sight of other court employees.  Upon information and belief, there was no legitimate purpose to this other than to stigmatize Plaintiff because she is a disabled, by sensationalizing the incident and turning it into a spectacle, as with the police tape cordoning off the courtroom and the employee's dishwashing gloves.

68.     Upon information and belief, Byrne encouraged, directed, or tolerated all these actions and thought these actions would intimidate Plaintiff and help to get rid of her so that Byrne and others in the courthouse would not have to deal with Plaintiff's disabilities, and so that Byrne would not have to discuss with Plaintiff her disabilities and accommodation requests.

69.     Plaintiff suffered extreme humiliation from all this treatment.  Upon information and belief, that was Defendants' intention.

70.     Defendants condoned this treatment of Plaintiff, as shown below, by repeatedly refusing to investigate or censure the treatment.  Defendants' condonation of this treatment shows egregious disregard for the letter, spirit, and historical purposes and contexts of the ADA, Rehab Act, and NYSHRL.

71.     For example, Congress enacted the ADA in 1990, expressly protecting people living with human immunodeficiency virus (HIV) or AIDS and to insist upon a rational basis for treatment of them in the workplace and in public accommodation; Congress acted despite the contemporaneous social context of great animus and hysterical reaction toward people living with HIV.[1]  At that time, courts, including New York State courts, had condoned employees' use of plastic gloves and surgical masks in the courtroom due to the presence of a defendant living with HIV or suspected to be living with AIDS, and a Westchester County judge held a court hearing in a parking lot for the same reason.[2]

_____

[1] *See, e.g.*, Consortium of Citizens with Disabilities, "Background and Justification for and Summary of the ADA Restoration Act," Association of University Centers on Disabilities (Sep. 2006) (discussing and citing the legislative history of the ADA), *available at* http://aucd.org/docs/policy/ada/2007_0727_adachronology.pdf; Ruth Colker, "Homophobia, AIDS Hysteria, and the Americans with Disabilities Act," 8 Journal of Gender Race and Justice 33 (Spring 2004) (same), *available at* http://moritzlaw.osu.edu/sites/colker2/files/2012/12/Homophobia-AIDS-Hysteria.pdf.

[2] *See* Dan Jacobsen, "Increasing Reports of AIDS Discrimination in Justice System," United Press International (Aug. 12, 1987), *available at* https://www.upi.com/Archives/1987/08/12/Increasing-reports-of-AIDS-discrimination-in-justice-system/7204555739200/; Philip Shenon, "Court Officers Wear Masks and Gloves at Trial of Defendant with AIDS," New York Times (Oct. 24, 1984), *available at* https://www.nytimes.com/1984/10/24/nyregion/court-officers-wear-masks-and-gloves-at-trial-of-defendant-with-aids.html.

72.     In 2017 and 2018, in the events described in this Complaint, Defendants should be held to a higher standard under the modern disability discrimination laws, to protect Plaintiff from rank prejudice and irrational hysteria.

**First Suspension (May 2, 2017 – July 15, 2018)**

73.     Judge Scheinkman did not contact Plaintiff about the May 1 incident or the employees' May 2 actions.

74.     Neither Judge Friia nor the other two WPCC judges contacted Plaintiff about the May 1 incident or the employees' May 2 actions.

75.     Upon returning to her chambers after conducting her afternoon calendar on May 2, Plaintiff received a hand delivery of Judge Marks's first order suspending her from performing her judicial duties.  Plaintiff immediately telephoned Judge Scheinkman, as he was her direct supervisor and the Administrator Judge in charge of WPCC.  Judge Scheinkman told Plaintiff that he did not originate the action to suspend her and "they went over my head to Judge Marks" or words to that effect.  He did not say who "they" were; upon information and belief, he was referring to Court System employees and/or their representatives.

76.     Also, on May 2, 2017, Judge Marks issued a letter prohibiting Plaintiff from appearing in the courthouse in her judicial capacity, and stating without any reasonable basis that the May 1 incident raised serious issues of public health and operational safety.  The letter further notified Plaintiff that pursuant to Part 113 of the Rules of the Chief Administrative Judge, Judge Marks was instituting a medical investigation after being advised that Plaintiff had been unable to fully perform her judicial duties in recent months.  Judge Marks stated that the medical investigation was

undertaken with the concurrence of the Presiding Justice of the Appellate Division, Second Department (Justice Randall T. Eng), as required by Part 113.

77.     Upon information and belief, the May 1 incident did not raise serious issues of public health or operational safety that would reasonably and lawfully justify immediate removal of Plaintiff from her judicial duties.

78.     Rather, the May 1 incident should have led to a discussion with Plaintiff about her medical needs, what accommodations the Court System could provide, and what adjustments and arrangements Plaintiff could make to avoid a repeat of the incident. This was particularly true considering Plaintiff's repeated requests to use the judges' restroom, and her other accommodation requests made to Byrne and Judge Friia in the preceding months.

79.     Under the law, it is not enough to simply raise the specter of "public health and safety" issues; any such assertion must be proven. *See* 29 C.F.R. § 1630.15(b)(2). Raising the specter of a direct threat is easy – it has been done for centuries, to scapegoat anyone whom the community does not like. Disabled people have long been sequestered and disregarded in the name of public health and safety. The purpose of the federal and state disability discrimination laws is to put a stop to that.

80.     Upon information and belief, in suspending Plaintiff without a discussion with her, Judge Marks bowed to pressure from employees, and he knew or should have known that his action was discriminatory and illegal.

81.     Judge Marks's wrongdoing and culpability in this regard are evidenced by the fact that neither he nor anyone else in the Court System's chain of command initiated or directed anyone else to initiate any discussion with Plaintiff before suspending her –

not even so much as a courtesy telephone call.  Judge Marks took his action precipitously – less than 24 hours after the May 1 incident.  There was no emergency under which he needed to act, just as there was no need for a hazmat operation or a police cordon of the courtroom.

82.     Upon information and belief, Judge Marks's wrongdoing and culpability are also evidenced by the fact that he did not comply with the letter and/or the spirit of Part 113.  For example, Part 113 makes no provision for suspending a judge, and makes no reference to suspension of a judge.  At the time of Judge Marks's suspension of Plaintiff, she was fully performing her duties.

83.     Assuming, without conceding, that it might have been reasonable for Defendants to make some request for medical examination of Plaintiff, nevertheless, obtaining any such medical examination did not reasonably require suspending Plaintiff from her judicial duties.

84.     In failing to make reasonable inquiry and give the matter due consideration before suspending Plaintiff, Judge Marks grossly and recklessly neglected and betrayed the duties of his office and the dignity of the judiciary while knowingly causing harm to Plaintiff on account of her disabilities and perceived disabilities.

85.     Plaintiff suffered extreme humiliation from the suspension.  Upon information and belief, that was Defendants' intention.

86.     The discriminatory basis of Judge Marks's suspension described above is further supported by subsequent events, especially the sequence of medical examinations and certifications unreasonably demanded of Plaintiff in the Part 113 investigation.

87.     The first suspension remained in effect for some 14½ months, until Plaintiff was permitted to return to work on July 16, 2018, and this was only after engaging counsel to assist her in making repeated and insistent efforts to assert her rights. Plaintiff was re-hospitalized twice more during her suspension, from June 6 to 8, 2017 and from June 21 to August 11, 2017 with a case of shingles.  Following her August 11 release, she accepted her doctors' recommendation to go into in-patient rehabilitation, where she remained until September 16, 2017.

88.     Plaintiff's inability to fully perform her duties during these hospitalizations in the summer of 2017 can shed no light on the motivation for Judge Marks's May 2, 2017 actions.

89.     During the 10-month period September 17, 2017 to July 16, 2018, Plaintiff enjoyed stable health, apart from one two-week period of illness.  She informed Defendants repeatedly that she was fully capable of performing her duties and repeatedly provided medical certifications to that effect.  During this 10-month period, Plaintiff appeared in public in her personal capacity and as a member of the judiciary on numerous occasions, without incident.  For example, during this 10-month period, she attended fundraisers for charitable organizations on at least six occasions; served as a panel judge for law school moot court competitions on two occasions;  attended numerous Rotary club luncheon meetings; attended five days of continuing legal education sessions hosted by the state bar association; attended numerous wakes and/or funerals and/or shiva calls for friends; attended a birthday gala and a retirement party; attended numerous other organized social events and community meetings; and attended three days of reunion events for her 40th college reunion at her undergraduate alma mater, Princeton University.

**Defendants' Discriminatory Requests for Medical Information and Examinations**

90.     During the 14½ months of her first suspension, Plaintiff cooperated fully with Defendants' numerous and redundant requests for medical information, while continually explaining her belief that the requests were disproportionate to Defendants' legitimate needs for her medical information, were motivated by stigma and animus, and were harassing and obstructionist in their effect.  While cooperating fully, Plaintiff expressly and repeatedly reserved her right to sue on these medical requests as made in violation of law.

91.     Assuming without conceding that some further request for a medical examination was reasonable after Plaintiff's summer 2017 hospitalizations, obtaining any such medical examination did not reasonably require maintaining the suspension of Plaintiff from performing her judicial duties.

92.     In addition, upon information and belief, Judge Marks did not comply with Part 113's requirement that he consult with the Presiding Justice of the Appellate Division, Second Department, before directing Plaintiff to submit to numerous and redundant medical examinations, or, if he did, he consulted only perfunctorily and not in the spirit of meaningful consideration required by Part 113.

93.     Under the regulations implementing the ADA, 29 C.F.R. §§ 1630.13 and 1630.14, an inquiry or medical examination may be justified when an employer must respond to an employee's request for accommodation for a disability, when the employee's ability to perform essential job functions will be impaired by a medical condition, or when an employee poses a direct threat to others due to a medical condition. An employer must have a reasonable belief, based on objective evidence, that one of these circumstances is present.

94.     Defendants lacked any such reasonable belief based on objective evidence for many or most of the medical examinations they demanded of Plaintiff during this 15-month period.

95.     Furthermore, many or most of the demands did not satisfy the requirements of the law because they were overly broad and not likely to reveal information related to whether Plaintiff could perform her duties without posing a threat to anyone.

96.     In compliance with Defendants' demands, Plaintiff provided Defendants with all her hospital and physician records for the first three quarters of 2017 in transmittals made in April, June, September, and October 2017.  The records that she provided totaled close to a thousand pages.  She provided all these records in unredacted form.

97.     Plaintiff also submitted to two medical examinations by Defendants' chosen physician, Dr. Hernandez, on May 24, 2017 and March 12, 2018.  At the end of both examinations, Dr. Hernandez told Plaintiff informally that he would recommend that Plaintiff be permitted to return to work.  During the second examination on March 12, 2018, Dr. Hernandez expressed surprise to Plaintiff that she had not been permitted to return to work since the previous May; he told Plaintiff that he was not aware of that fact until she told him.

98.     The second examination (March 12, 2018) by Dr. Hernandez was originally scheduled for November 17, 2017, after Plaintiff had provided all her 2017 medical and hospital records through that date.   On November 16, 2017, Defendants unilaterally cancelled the November 17 examination, demanding that Plaintiff first

schedule a further examination with her own pulmonary hypertension specialist, Dr.

Berman. This demand was unreasonable, and a pretext for delay, because Plaintiff had

previously provided a report from Dr. Berman dated August 29, 2017 in which Dr.

Berman noted that Plaintiff would be ready to return to work when she was discharged

from in-patient rehabilitation if she was back to her baseline oxygen requirement of three

to four liters. At Defendants' request, Plaintiff had previously provided a report from her

local pulmonary specialist, Dr. Wurm, dated October 23, 2017, verifying that Plaintiff's

baseline oxygen requirement was met and she "is stabilized on her current medications

and is likely stable for return to work on the bench as long as she continues to utilize

continuous oxygen at a flow of 4L/min." Defendants rejected Dr. Wurm's report, arguing

that it was ambiguous as to whether Plaintiff was ready to return to work; Defendants did

not telephone Dr. Wurm to clarify the meaning of his letter or his use of the words

"likely" and "as long as."

99.   Instead, Defendants insisted that Dr. Hernandez must have a second

examination of Plaintiff, and then insisted that Dr. Hernandez could not examine Plaintiff

until both of Plaintiff's pulmonary specialists had conducted new examinations of

Plaintiff and independently verified that her oxygen baseline was met.

100.   This was an example of Defendants' moving the goalposts to delay and

prevent Plaintiff from returning to work, despite her readiness to return, her doctors' clear

indications that she was ready, and Defendants' own doctor's determination on May 24,

2017 that she was fit to work. Upon information and belief, unreasonable and prejudicial

delay and obstruction was Defendants' intention.

101.    Additionally, on January 2, 2018, Defendants unreasonably demanded that Plaintiff submit a new report from her primary care physician, Dr. Rubin, and unreasonably demanded that Plaintiff submit to an examination by Defendants' chosen pulmonary specialist, Dr. Shulman.

102.    Upon information and belief, there are numerous pulmonologists in Westchester, in Manhattan, and in Queens.  Nonetheless, Defendants chose as their pulmonologist a doctor practicing in Nassau County, a decision which, upon information and belief, was intended to inconvenience and harass Plaintiff.

103.    Furthermore, Defendants insisted that they would not schedule the appointment with Dr. Shulman until they had received the further certification requested from Plaintiff's pulmonary hypertension specialist, Dr. Berman.

104.    These demands were further examples of Defendants' moving the goalposts to delay and prevent Plaintiff from returning to work, by means of unreasonable and overly burdensome demands for duplicative medical examinations.

105.    Nevertheless, as requested by Defendants, Plaintiff submitted a new report from her primary care physician, Dr. Rubin, dated January 18, 2018, and a new report from her pulmonary hypertension specialist, Dr. Berman, dated February 2, 2018.

106.    Plaintiff also submitted to examination by Defendants' pulmonary specialist, Dr. Shulman, on March 8, 2018.  That examination lasted about 20 minutes. At the end of the examination, Dr. Shulman told Plaintiff informally that he would recommend that Plaintiff be permitted to return to work.

107.    Defendants also unreasonably demanded examination of Plaintiff by a psychiatrist without any legitimate basis.  Plaintiff submitted to two psychiatric

examinations by Defendants' chosen psychiatrist, Dr. Portnow, on June 6, 2017 and

March 28, 2018.  The first examination was aborted early on by the failure of Plaintiff's

oxygen concentrator to function.  The second examination with Dr. Portnow lasted about

90 minutes.  During that examination, Dr. Portnow told Plaintiff that Defendants

explained to him the need for his examination because Plaintiff was "having trouble

getting along with coworkers" or words to that effect.  At the end of the examination, Dr.

Portnow told Plaintiff informally that he would recommend that Plaintiff be permitted to

return to work.

108.    All of Plaintiff's disabilities, and the May 1, 2017 incident in the

courthouse, are physical issues, not mental health issues.  Upon information and belief,

there was no legitimate need for a psychiatric evaluation of Plaintiff, especially without

any conversation having been had between her and any of her supervisors or Court

System administrators.  Upon information and belief, Defendants intended the demand

for a psychiatric evaluation to humiliate and intimidate Plaintiff and to avoid their own

obligation to discuss with Plaintiff her needs as a physically disabled employee.

109.    Plaintiff remained in a state of anxiety throughout these demands, as she

was constantly being made to hope that each doctor's certification would suffice, only to

be met with more demands at every turn.  Plaintiff suffered extreme humiliation and

intimidation.  Upon information and belief, that was Defendants' intention; indeed, upon

information and belief, the accumulation of unreasonable demands was intended to harass

Plaintiff and to keep alive the hostile work environment begun by Chief Clerk Byrne and

the courthouse employees in the workplace itself.

**Other Discrimination, Retaliation, and/or Interference**

110.    During the week of June 12, 2017, Judge Scheinkman telephoned Plaintiff.  He began the call by telling Plaintiff, "I'm just the messenger."  He then explained that the purpose of his call was to inform Plaintiff that Defendants forbade her from attending the judicial training sessions that she was scheduled to attend the following week at a large hotel in Westchester.   Because Plaintiff remained a judge in good standing despite her suspension, and because she posed no security or health risk, there was no legitimate reason for barring Plaintiff from attending the trainings, which were required of all judges.  Upon information and belief, Defendants' prohibition against her attending was motivated by discrimination, retaliation, and/or intended interference with Plaintiff's enjoyment of her rights.

111.    Following Plaintiff's suspension, Court System employees stepped up their campaign of hostility in a successful effort to publicize false information about her which, upon information and belief, was intended to stigmatize her and turn others against her.  Defendants either tolerated or failed to correct this harassment of Plaintiff and this interference with Plaintiff's rights.

112.    On or about June 3, 2017, Judge Marks's May 2 order suspending Plaintiff was leaked to the press and published in a blurry photograph that appears to be an amateur using a camera phone.[3]  Upon information belief, one or more of Defendants' employees leaked this information and document with malicious intent toward Plaintiff.

---

[3] John F. Bailey, "New City Court Judge Elizabeth Shollenberger Caseload Reassigned.  Will Not Get New Cases Until She Is Able To Return to the Bench.  No Return Date Set," White Plains CitizeNetReporter (June 3, 2017).

113.    On or about June 22, 2017, the New York Post published a highly stigmatizing and inflammatory article about Plaintiff in both print and online editions.[4] The article highlighted Plaintiff's "obesity" in its headline and its reporting.  The article included a host of wildly inaccurate, crass, and hateful allegations, quoting and attributing unnamed court employees.  For example, the article reported that Plaintiff came to work with diarrhea running down her leg, and that she soiled her chair, neither of which had ever occurred, and reported that these things were habitual ("would come," "would soil").  The article falsely reported that the judicial review committee "rejected" Plaintiff's application for the judgeship; that Plaintiff was completely unable to climb the three steps to the judge's seat; and other inaccuracies.  The article falsely and prejudicially stated that the Court System "determined [Plaintiff] was 'unable to perform her job.' "  Outrageously, the article's only quote attributed to a named source (who was not an employee of Defendants) hatefully predicted Plaintiff's death or incapacity before the end of her 10-year term after falsely stating that Plaintiff uses an oxygen "tank"; this was the statement of a Westchester County political actor.

114.    Defendants' spokesperson Lucian Chalfen is quoted at the end of the New York Post article as saying, "The situation remains under review."  Chalfen made no contact with Plaintiff at that time before responding to the New York Post.  Upon information and belief, Chalfen made no attempt to correct the prejudicial inaccuracies and injurious aspersions in the article.

---

[4] "Dems Give Politically Connected Judge Six-Figure Gig She's Too Obese To Do," New York Post (June 22, 2017).

115.    In letters sent by her attorney on June 29, 2017, July 24, 2017, and October 2, 2017, Plaintiff admonished Defendants to be aware of their employees' hostility and to take steps to prevent them from injuring Plaintiff falsely in public statements.  Plaintiff noted that the false reports injured not just her, but the dignity of the judiciary and the Court System at the same time.  Further, Plaintiff questioned whether Judge Marks acted on such false reports of courthouse employees when he suspended her. Plaintiff also requested that Defendants hear her account of the events and her accommodation needs in a meeting or interview.

116.    In letters dated July 28, 2017 and October 5, 2017, Defendants denied Plaintiff's requests for a meeting or interview to hear her account of events and her accommodation needs.  Defendants insisted that no discussion of Plaintiff's accommodation needs for her disabilities would be appropriate until after Judge Marks's Part 113 investigation was concluded and a determination was made as to whether Defendants would consider Plaintiff fit to return to work.

117.    Additionally, in the July 28 letter, Defendants responded to Plaintiff's request for an interview to hear her account of events leading up to her suspension by saying that a confidential investigation would be conducted by Defendants' Office of the Inspector General, and the letter asked Plaintiff to schedule an interview to discuss those matters with that Office.

118.    Relying on Defendants' statement, Plaintiff sat for a two-hour interview with a Deputy Inspector General on September 26, 2017 and discussed the events in the courthouse, her medical needs, and her requests for accommodation.

119.    Yet, after the interview, when Plaintiff requested a copy of the Inspector General's report, Defendants maintained that the Inspector General's report could not be shared with Plaintiff and did not constitute the Court System's engagement in an interactive process to discuss with Plaintiff her needs for accommodation.

120.    After receiving this response from Defendants, Plaintiff renewed her request for an interview with Defendants so that Defendants could themselves directly hear Plaintiff's account of events and discuss her medical needs with her.  Defendants again denied this request, saying only that they would address Plaintiff's requests for accommodations of her disabilities only when Judge Marks approved Plaintiff's return to active judicial duty.

121.    Defendants want to "have it both ways."  They steadfastly remained unwilling to interview Plaintiff to hear her account of the events leading up to her suspension.  Yet they maintain that they can delegate such an interview to their Inspector General, while claiming complete confidentiality of the Inspector General's report and conclusions.

122.    Upon information and belief, Defendants' refusal to hear and acknowledge Plaintiff's account of events constitutes discrimination against her, retaliation for protected activity in engaging an attorney and pursuing legal claims, and intimidation intended to interfere with her enjoyment of her rights.

123.    Defendants have waived their right to maintain confidentiality of the Inspector General's report, given that they assigned to the Inspector General the task of hearing Plaintiff's account of the events in question, including the accommodation needs that she had discussed with Byrne in the months prior to her first suspension.

124.    Defendants also failed to take steps to prevent Court System employees from continuing to injure Plaintiff falsely in public statements, as Plaintiff requested and admonished Defendants to do.

125.    On March 5, 2018, an attorney, Andrew D. Brodnick ("Brodnick"), filed an affirmation on the public court docket of an action in the Westchester County Supreme Court swearing that he "ha[d] been advised by the White Plains City Court that Ms. Shollenberger is no longer a judge in the White Plains City Court."  A copy of Brodnick's affirmation is attached as Exhibit A and incorporated in this Complaint.  In the action, Plaintiff represented the tenant-plaintiff against his former landlord in a dispute over the return of the tenant-plaintiff's security deposit.  The matter was resolved with the issuance of a default judgment in September 2016, several months before Plaintiff became a judge.  Plaintiff explained to her client that as a consumer advocate attorney she did not undertake judgment collection efforts, and he would need to make separate arrangements with another attorney to collect the judgment.  Since the case was resolved in September 2016 and no attorney had appeared on behalf of the defendant in that case, there was no reason for Plaintiff to update her status on the docket of this case in December 2016 when she was appointed to her judgeship, given that she updated all other necessary court records and she was unaware of any attorney for the defendant to notify.

126.    Brodnick moved to reopen the case in October 2017, and no attorney for the tenant-plaintiff in the case, other than Plaintiff (Judge Shollenberger), was listed as an attorney of record.

127.    On March 5, 2018 Plaintiff received electronic notice of Brodnick's court filing, and, through her attorney, reached out to Brodnick for further information. Brodnick revealed to Plaintiff's attorney that he sent an express delivery mailing to Plaintiff at WPCC in or around November 2017, and that he thereafter spoke with a clerk at WPCC who told him that Plaintiff was "no longer a judge" and that WPCC had "no forwarding address" for Plaintiff.

128.    Plaintiff never received Brodnick's November 2017 express mail.  Upon information and belief, one or more employees at WPCC knowingly failed to forward Plaintiff's mail to her on this occasion, and perhaps on other occasions as well; such action constituted discrimination and was a part of the employees' campaign of intimidation against Plaintiff intended to interfere with her enjoyment of her rights.

129.    In a letter sent by her attorney on March 7, 2018, Plaintiff brought Brodnick's revelations and the actions of the WPCC employee or employees to Defendants' attention.  Plaintiff noted the obvious implications of the WPCC employee's false statements to Brodnick.  The false statement implied that Plaintiff was fired from her job or abandoned it soon after her appointment, and that Plaintiff failed in her professional and ethical responsibilities to apprise the public and the Court System of her current address and whereabouts.  Plaintiff noted that these injurious and false implications and statements echoed or mirrored the unnamed employee's false statement made in the New York Post article that the Court System had determined that Plaintiff was unable to perform her job.  Plaintiff noted that Defendants failed to take appropriate steps, as she had demanded, to ensure that the courthouse employees would stop defaming her publicly.  Noting that Defendants had agreed to participate in mediation

37

with the EEOC on March 21, 2018, Plaintiff asked that Defendants present a plan for training and correcting this lawless and injurious behavior on the part of their employees as part of the mediation session.  Finally, Plaintiff indicated that she would supplement her EEOC Charge to include these events as further instances of discrimination by Defendants.

130.    In an email dated March 16, 2018, Defendants' attorney represented to the EEOC that the WPCC clerk's statements to Brodnick would be brought to Byrne's attention "and appropriate action will be taken."

131.    However, in private, Defendants' attorney acknowledged on March 16, 2018 and again on May 4, 2018 that Defendants took no action; he stated that the reason no action was taken was because Defendants did not know which employee made the false statements to Brodnick.

132.    Upon information and belief, Defendants' refusal to take action was discriminatory, retaliatory, and intended to interfere with Plaintiff's enjoyment of her rights.  The assertion that Defendants did not know which employee was responsible for the statements to Brodnick was meaningless and a pretext, since there are in total only a small number of employees who work at WPCC, and in any case Plaintiff had requested that Defendants instruct all employees to speak appropriately and truthfully about Plaintiff's status and how to handle her mail, not just the employee who spoke with Brodnick.

133.    Additional events also indicate Defendants' failure to safeguard Plaintiff's privacy after being warned, failure to prevent and put a stop to the interference with Plaintiff's rights after being warned, and Defendants' intentional reputational harm.  In

November 2017, White Plains mayoral candidate Milagros Lecuona ("Lecuona")

mentioned Plaintiff at the League of Women Voters debate held at White Plains High

School.  Lecuona stated to the public that a Court System Inspector General investigation

pertaining to Plaintiff was underway.  Clearly someone at a high administrative level in

the Court System leaked this information, since Defendants claim that they maintain the

Inspector General's investigation in the strictest confidence.

**Return to Work (July 16 – August 15, 2018) and Second Suspension (August 15, 2018 – Present)**

134.    On June 29, 2017, in writing, Plaintiff requested a copy of Dr.

Hernandez's and Dr. Portnow's reports.

135.    On July 7, 2017, Defendants' attorney responded to Plaintiff's request and

indicated that, pursuant to Defendants' policy, Defendants would provide Plaintiff with a

copy of Dr. Hernandez's and Dr. Portnow's reports only after the Part 113 investigation

was concluded.

136.    However, Defendants later refused to provide the reports when asked to do

so in two requests sent after the Part 113 investigation was concluded.  Defendants did

not give a reason for this; in fact, they simply ignored the two follow-up requests and the

reference made in those requests to Defendants earlier assurance that they would provide

the reports after the investigation was concluded.  Upon information and belief, this

refusal is motivated by retaliation for Plaintiff's December 2017 EEOC Charge and/or

intended interference with Plaintiff's rights.

137.    Defendants issued no formal determination following Judge Marks's Part

113 investigation.

138.    However, Defendants arranged a meeting held at WPCC on May 4, 2018 for the purpose of discussing the arrangements required by the Court System and the accommodations requested by Plaintiff in anticipation of Plaintiff's return to active judicial duty.  The meeting lasted over three hours and was attended by a number of Court System principals, including, for the first half hour, Judge Davidson.  The meeting was followed up with further discussions in May, June, and July 2018 to reach agreement on the arrangements and accommodations needed, before Plaintiff was permitted to return to work.  Plaintiff requested that she be permitted to return to the bench while these discussions continued, but Defendants refused this request.

139.    The arrangements and accommodations agreed upon included, among other things, that the Court System would provide odor-free waste receptacles for Plaintiff's use for her discarded bandages and incontinence pads, and both parties agreed to monitor and communicate about any difficulties or employee concerns.

140.    At the meeting, WPCC's Chief Clerk Byrne was identified as the designated liaison for communicating with Plaintiff, the courthouse employees, and the Court System about any problems or concerns that the courthouse employees might have or any difficulties that Plaintiff might experience.

141.    Plaintiff requested that these agreed-upon arrangements and accommodations be committed to writing, and that a meeting with the courthouse staff be held to discuss Plaintiff's return.  Defendants refused both of these requests, giving assurance instead that communication lines would be kept open through Byrne and to some extent Judge Friia after Plaintiff returned.

142.  Plaintiff returned to work on July 16, 2018.  On that morning, Plaintiff took the initiative to treat the courthouse staff to a large breakfast at her personal expense that she had catered by Panera Bread.

143.  During the following four and a half weeks, Plaintiff performed all her duties and was extremely happy to be back to work.

144.  During this period, Plaintiff attended a four-day training on New York's "raise the age" legislation.  This training was required for all judges (including Plaintiff) who arraign criminal defendants on weekends.

145.  During this period, Plaintiff took one day off on August 1, 2018, to attend an out of town doctor's appointment that was scheduled in the middle of the day.

146.  During this period, Plaintiff repeatedly asked Byrne if everything was going okay, and each time Byrne responded yes, that everything was fine.  Plaintiff also regularly saw and spoke with her three fellow WPCC judges, as well as with numerous courthouse employees.  No one communicated any complaint or concern to Plaintiff during this month-long period.

147.  At 9:43 on the morning of August 15, 2018, Judge Davidson sent Plaintiff an email saying she would stop by "to chat for a few minutes."  Plaintiff did not see the email until later in the day, because she was already on the bench and conducting court when the email was sent.

148.  During the morning court session, Judge Davidson came and observed Plaintiff in the courtroom.

149.  Afterward, Judge Davidson met with Plaintiff and the Deputy Chief Clerk of WPCC in Plaintiff's chambers.

150.    In their meeting, Judge Davidson specifically praised Plaintiff's conduct of the courtroom and her interaction with the litigants, and had no criticisms or constructive suggestions.

151.    Judge Davidson's August 15 observation of Plaintiff was the first time that a supervisor ever observed or commented on Plaintiff's performance as judge.

152.    Then Judge Davidson informed Plaintiff that courthouse employees had complained of unpleasant and offensive odors.

153.    Plaintiff told Judge Davidson that she had developed a leg infection that week.  Plaintiff explained that a faint odor can result from the lymph or pus in discarded bandages when the leg is infected.

154.    Upon hearing this, Judge Davidson turned to the Deputy Chief Clerk and asked her whether anyone at WPCC had distributed or put to use the odor-free waste receptacles that had been purchased and delivered to WPCC.

155.    By asking this question, Judge Davidson showed that she was aware of the arrangements and accommodations that had been finalized and agreed upon pursuant to the May 4 meeting.

156.    The Deputy Chief Clerk replied that the receptacles had not been put to use.  Judge Davidson then directed her to put them to use.  Within an hour or so of the end of their meeting, the Deputy Chief Clerk had placed one of the odor-free receptacles in Plaintiff's judicial chambers, and another one in the judges' restroom, for Plaintiff's use.

157.    Thus, until Judge Davidson intervened in this August 15 meeting, Defendants had failed to implement the arrangement or accommodation that Defendants

had agreed to provide pursuant to the May 4 meeting in order to make Plaintiff's return to work in mid-July as issue-free as possible, even though these receptacles were on premises.

158.    Similarly, no issue, concern, or employee complaint was communicated to Plaintiff by Chief Clerk Byrne or Byrne's deputy, as Defendants had arranged and agreed pursuant to the May 4 meeting; that agreement was intended to forestall the development of any problem or issue after Plaintiff's return to work.

159.    Judge Marks signed the second suspension order only a few hours after the Deputy Chief Clerk acknowledged to Judge Davidson and to Plaintiff that WPCC had failed to put to use the odor-free waste containers for Plaintiff's disabilities that the Court System had agreed to provide.

160.    The only reason that Defendants have given for the second suspension is the employees' complaints of odors and a leaking bandage on Plaintiff's leg.  Further, Judge Marks signed the second suspension order only a few hours after the odors were brought to Plaintiff's attention by Judge Davidson.  This violated the letter and spirit of the agreements reached by the parties pursuant to the May 4 meeting pertaining to early communication of any employee complaints or other issues about Plaintiff's health.

161.    A suspension of an employee is not warranted by other employees' complaints of "odors" or a leaking bandage, and certainly not without a discussion with the employee to correct the same and avoid such things in the future.  This suspension of Plaintiff was unreasonable.

162.    This suspension of Plaintiff was also not justified by Plaintiff's communication to Judge Davidson that she had a leg infection.  Defendants were aware

from the previous medical examinations and reports that Plaintiff had a recurring leg infection for many years.  Defendants permitted Plaintiff to return to work in July 2018 with full knowledge of Plaintiff's recurring leg infection and the treatments and care that it required.

163.    Plaintiff's leg infection in no way prevented her from performing any of her duties fully in August 2018.

164.    In an email sent at 5:41 p.m. on August 15, 2018, Plaintiff was called to meet with one of Judge Davidson's deputies, Justice Sam D. Walker ("Justice Walker"), the following morning, August 16.  At that meeting, Justice Walker handed to Plaintiff Judge Marks's second suspension order signed the previous day.  Justice Walker did not discuss with Plaintiff the reason for this second suspension.

165.    Judge Davidson did not telephone or email Plaintiff to inform her of the suspension.  Judge Davidson also did not mention any possibility of a suspension during her meeting with Plaintiff on the morning of August 15.

166.    Plaintiff was told that Judge Davidson was traveling on August 16 and that was why Plaintiff would be meeting with Justice Walker instead of Judge Davidson.

167.    At the time of filing this Complaint, the second suspension remains in effect, despite Plaintiff's protests to Defendants that the suspension was authorized and implemented and is being maintained in violation of law and in violation of the agreements reached pursuant to the May 4 meeting.

168.    When pressed for an explanation for the suspension, Defendants responded by invoking Part 113 again.  Judge Marks stated in his letter to Plaintiff that he was "advised that you have not been able to fully perform your judicial duties in recent

44

weeks, due to what appear to be medically-related conditions." On this ground, Judge Marks ordered further medical evaluations. Defendants also again cited concerns about "the health and safety of all [the Court System's] employees and public."

169.    Plaintiff fully performed her judicial duties from July 16, 2018 through August 15, 2018, with just one day of absence for an out-of-town doctor's appointment. Thus, Defendants' invocation of Part 113 was inappropriate, and a pretext for discrimination, retaliation, and/or interference.

170.    Upon information and belief, any medical evaluations demanded by Defendants based upon Plaintiff's August 15 conversation with Judge Davidson and the underlying employee complaints of odors and a leaking bandage are unwarranted intrusions and violations of law. Defendants had previously obtained all of Plaintiff's medical information they could legitimately need (and much more) before she returned to work.

171.    Neither Judge Davidson nor anyone else from the Court System discussed with Plaintiff whether a further medical evaluation might be necessary. Defendants' failure to engage in a dialogue with Plaintiff was a violation of the agreements between the parties reached pursuant to the May 4 meeting.

172.    This also constituted a further example of Defendants' failure under the law to engage in an interactive process with Plaintiff to discuss her health needs with her.

173.    These new demands for medical information, and the second suspension of Plaintiff from performing her duties, are part of the same continuing violation against Plaintiff, designed to intimidate and harass her so that she will not return to her rightful job to perform the judicial duties she was appointed to perform and able to perform.

174. Upon information and belief, Defendants have no remaining legitimate concern about the health and safety of their employees and the public that was not previously addressed by Defendants' chosen physicians, or if it was not so addressed that was Defendants' fault and cannot now justify suspending Plaintiff and demanding further medical examinations of her.

175. The employees' objection to odors and a leaking bandage, and Judge Marks's willingness to suspend Plaintiff a second time on this basis, betray Defendants' true motivation: stigmatization of Plaintiff as a disabled person, discrimination against her without a meaningful effort to accommodate her disabilities, retaliation against her for pursuing her legal rights, and intended interference with her enjoyment of her rights.

176. As with the first suspension, Plaintiff is cooperating with Defendants' demands for medical information, under protest and reserving her legal rights and remedies, and seeks redress for her second suspension and these further demands for medical information as unreasonable and violations of law.

177. On October 16, 2018, Plaintiff submitted to an examination of two and a half hours by Defendants' chosen physician, Dr. Keolamphu, who shares an office and medical practice with Dr. Hernandez. Among other things, Dr. Keolamphu questioned Plaintiff about the leg infection that Plaintiff had mentioned to Judge Davidson on August 15, 2018. Plaintiff explained that the leg infection was a recurring one over many years and had been discussed with Dr. Hernandez in Plaintiff's previous examinations in the office.

178.     Dr. Keolamphu did not, however, discuss or question Plaintiff about odors or bandaging, which were the reasons cited by Defendants for Plaintiff's second suspension.

179.     Assuming without conceding that some further request for a medical examination was reasonable based on alleged employee complaints in August 2018 about odors and a leaking bandage, obtaining any such medical examination did not reasonably require suspending Plaintiff from performing her judicial duties, and it did not reasonably justify the examination that was administered by Dr. Keolamphu.

180.     Plaintiff's leg infection, which she discussed with Judge Davidson on August 15, 2018, did not reasonably support or justify Defendants' demand that Plaintiff submit to an examination by Dr. Keolamphu, because it was a recurring leg infection which was the subject of previous medical examinations obtained by Defendants and conducted by Dr. Keolamphu's colleague, Dr. Rodriguez.

181.     Defendants made no attempt to discuss the leg infection, or the alleged odors and leaking bandage, with Plaintiff to determine whether a medical examination was appropriate.

182.     After receiving her right to sue from the Department of Justice in August 2018, Plaintiff requested a meeting with Defendants' attorney and Judge Davidson (Plaintiff's direct supervisor and the administrative judge with jurisdiction over WPCC) to discuss the possibility of settling Plaintiff's claims without the need for a litigation that would be in the public eye.  Defendants responded to this request, and declined to hold such a meeting.

183.     Defendants thus left Plaintiff with no choice but to commence this legal action.  Defendants' refusal to meet with Plaintiff before the commencement of litigation, like their repeated refusals to meet with Plaintiff to hear her version of events in the courthouse in 2017, is a sign of Defendants' bad faith, disregard for the dignity of the judiciary, and disregard for the rights of disabled people to work in their jobs and contribute meaningfully to society.

## AS AND FOR A FIRST CLAIM
### (ADA – Disability Discrimination – Against All Defendants)

184.     Plaintiff repeats and re-alleges the allegations made hereinbefore.

185.     Plaintiff has had at all relevant times a disability or disabilities within the meaning of the ADA.  Plaintiff was able to perform the essential functions of her job and therefore was at all relevant times a qualified individual with a disability within the meaning of the ADA.

186.     By the acts described above, including refusing to grant reasonable accommodations for Plaintiff's known disabilities, creating and tolerating a hostile work environment, suspending Plaintiff from performing her duties, requiring prohibited medical examinations and inquiries of her, and repeatedly moving the goalposts, Defendants discriminated against Plaintiff in the terms and conditions of her employment on the basis of her disabilities known to Defendants and perceived disabilities, in violation of the ADA.

187.     Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

188.     As a result of Defendants' discriminatory acts, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury to her professional and

personal reputation, monetary damage, mental anguish, pain and suffering, extreme humiliation, and other compensable damages unless and until this Court grants the relief requested herein.

## AS AND FOR A SECOND CLAIM
### (ADA – Interference – Against All Defendants)

189.    Plaintiff repeats and re-alleges the allegations made hereinbefore.

190.    Plaintiff has had at all relevant times a disability or disabilities within the meaning of the ADA.  Plaintiff was able to perform the essential functions of her job and therefore was at all relevant times a qualified individual with a disability within the meaning of the ADA.  Plaintiff attempted to exercise and enjoy her rights under the ADA.

191.    By the acts described above, including intimidating and coercing Plaintiff and encouraging and permitting their employees to intimidate and coerce her, Defendants interfered with Plaintiff's exercise and enjoyment of her disability rights, in violation of the ADA.

192.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

193.    As a result of Defendants' acts of interference, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury to her professional and personal reputation, monetary damage, mental anguish, pain and suffering, extreme humiliation, and other compensable damages unless and until this Court grants the relief requested herein.

## AS AND FOR A THIRD CLAIM
### (ADA – Retaliation – Against All Defendants)

194.    Plaintiff repeats and re-alleges the allegations made hereinbefore.

195.    Plaintiff engaged in protected activity to enforce her rights under the ADA by engaging an attorney to communicate with Defendants about her rights and by filing a Charge of Discrimination with the EEOC.

196.    By the acts described above, Defendants retaliated against Plaintiff for engaging in protected activity, in violation of the ADA.

197.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

198.    As a result of Defendants' retaliatory acts, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury to her professional and personal reputation, monetary damage, mental anguish, pain and suffering, extreme humiliation, and other compensable damages unless and until this Court grants the relief requested herein.

### AS AND FOR A FOURTH CLAIM
### (Rehab Act – Disability Discrimination – Against Court System)

199.    Plaintiff repeats and re-alleges the allegations made hereinbefore.

200.    Plaintiff has had at all relevant times a disability or disabilities within the meaning of the Rehab Act.  Plaintiff was able to perform the essential functions of her job and therefore was at all relevant times a qualified individual with a disability within the meaning of the Rehab Act.

201.    Defendant Court System accepts federal funding and has thus consented to suit under the Rehab Act.

202.    By the acts described above, including refusing to grant reasonable accommodations for Plaintiff's known disabilities, creating and tolerating a hostile work environment, suspending Plaintiff from performing her duties, requiring prohibited

medical examinations and inquiries of her, and repeatedly moving the goalposts, Defendant discriminated against Plaintiff in the terms and conditions of her employment on the basis of her disabilities known to Defendant and perceived disabilities, in violation of the Rehab Act.

203.    Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

204.    As a result of Defendant's discriminatory acts, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury to her professional and personal reputation, monetary damage, mental anguish, pain and suffering, extreme humiliation, and other compensable damages unless and until this Court grants the relief requested herein.

**AS AND FOR A FIFTH CLAIM**
**(Rehab Act – Interference – Against Court System)**

205.    Plaintiff repeats and re-alleges the allegations made hereinbefore.

206.    Plaintiff has had at all relevant times a disability or disabilities within the meaning of the Rehab Act.  Plaintiff was able to perform the essential functions of her job and therefore was at all relevant times a qualified individual with a disability within the meaning of the Rehab Act.  Plaintiff attempted to exercise and enjoy her rights under the Rehab Act.

207.    Defendant Court System accepts federal funding and has thus consented to suit under the Rehab Act.

208.    By the acts described above, including intimidating and coercing Plaintiff and encouraging and permitting their employees to intimidate and coerce her, Defendant

Court System interfered with Plaintiff's exercise and enjoyment of her disability rights, in violation of the Rehab Act.

209.    Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

210.    As a result of Defendant's acts of interference, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury to her professional and personal reputation, monetary damage, mental anguish, pain and suffering, extreme humiliation, and other compensable damages unless and until this Court grants the relief requested herein.

### AS AND FOR A SIXTH CLAIM
### (Rehab Act – Retaliation – Against Court System)

211.    Plaintiff repeats and re-alleges the allegations made hereinbefore.

212.    Plaintiff engaged in protected activity to enforce her rights under the Rehab Act by engaging an attorney to communicate with Defendants about her rights and by filing a Charge of Discrimination with the EEOC.

213.    Defendant Court System accepts federal funding and has thus consented to suit under the Rehab Act.

214.    By the acts described above, Defendant Court System retaliated against Plaintiff for engaging in protected activity, in violation of the Rehab Act.

215.    Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

216.    As a result of Defendant's retaliatory acts, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury to her professional and personal reputation, monetary damage, mental anguish, pain and suffering, extreme humiliation,

and other compensable damages unless and until this Court grants the relief requested herein.

**AS AND FOR A SEVENTH CLAIM**
**(NYSHRL – Disability Discrimination – Against DiFiore and Marks)**

217.    Plaintiff repeats and re-alleges the allegations made hereinbefore.

218.    Plaintiff has had at all relevant times a disability or disabilities within the meaning of the New York Executive Law.  Plaintiff was able to perform the essential functions of her job and therefore was at all relevant times a qualified individual with a disability within the meaning of the New York Executive Law.

219.    By the acts described above, and acting in their capacities as Plaintiff's employers, Defendants DiFiore and Marks actually participated in discrimination against Plaintiff in the terms and conditions of her employment on the basis of her disabilities known to Defendants and perceived disabilities, including refusing to grant reasonable accommodations for Plaintiff's known disabilities, creating and tolerating a hostile work environment, suspending Plaintiff from performing her duties, requiring prohibited medical examinations and inquiries of her, and repeatedly moving the goalposts, Defendants discriminated against Plaintiff in the terms and conditions of her employment on the basis of her disabilities known to Defendants and perceived disabilities, in violation of the New York Executive Law.

220.    Defendants acted intentionally with malice and/or reckless indifference to Plaintiff's state-law rights and are liable to Plaintiff in their individual capacities as employers with power to do more than carry out personnel decisions made by others.

221.    As a result of Defendants' acts, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury to her professional and personal reputation,

monetary damage, mental anguish, pain and suffering, extreme humiliation, and other compensable damages unless and until this Court grants the relief requested herein.

## AS AND FOR AN EIGHTH CLAIM
### (NYSHRL – Retaliation – Against DiFiore and Marks)

222.   Plaintiff repeats and re-alleges the allegations made hereinbefore.

223.   Plaintiff engaged in protected activity to enforce her rights under the New York Executive Law by engaging an attorney to communicate with Defendants about her rights and by filing a Charge of Discrimination with the EEOC.

224.   By the acts described above, and acting in their capacities as Plaintiff's employers, Defendants DiFiore and Marks retaliated against Plaintiff for engaging in protected activity, in violation of the New York Executive Law.

225.   Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's state-law rights and are liable to Plaintiff in their individual capacities as employers with power to do more than carry out personnel decisions made by others.

226.   As a result of Defendants' acts, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury to her professional and personal reputation, monetary damage, mental anguish, pain and suffering, extreme humiliation, and other compensable damages unless and until this Court grants the relief requested herein.

## AS AND FOR A NINTH CLAIM
### (NYSHRL – Aiding and Abetting – Against DiFiore and Marks)

227.   Plaintiff repeats and re-alleges the allegations made hereinbefore.

228.   Plaintiff complained to Defendants DiFiore and Marks of their own and each other's discriminatory and retaliatory actions.

229.    By the acts described above, Defendants DiFiore and Marks aided and abetted their own and each other's discrimination and retaliation against Plaintiff by failing to conduct a proper investigation or take remedial measures in response to Plaintiff's complaints, and thus provided assistance in aid of that discrimination and retaliation, in violation of the New York Executive Law.

230.    Defendants shared a community of purpose and shared the intent of the principal discriminatory acts, with malice and/or reckless indifference to Plaintiff's state-law rights and are liable to Plaintiff in their individual capacities as aiders and abettors of discrimination and retaliation.

231.    As a result of Defendants' acts, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury to her professional and personal reputation, monetary damage, mental anguish, pain and suffering, extreme humiliation, and other compensable damages unless and until this Court grants the relief requested herein.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court enter a judgment:

(a)    declaring that the acts and practices complained of herein violated the ADA, Rehab Act, and NYSHRL;

(b)    permanently enjoining and restraining Defendants DiFiore and Marks in their official capacities from committing or tolerating the violations alleged herein, and directing them, among other things, to end the suspension of Plaintiff from performing her judicial duties, grant reasonable accommodations to Plaintiff for her disabilities, and train and monitor all Defendants' employees with respect to disability discrimination, pursuant to the ADA, Rehab Act, and NYSHRL;

(c)      awarding Plaintiff monetary damages against Defendant Court System to be determined at trial for the pain and suffering and reputational and professional harm she has suffered, pursuant to the Rehab Act;

(d)      awarding Plaintiff monetary damages against Defendants DiFiore and Marks in their individual capacities as employers to be determined at trial for the pain and suffering and reputational and professional harm she has suffered, pursuant to the NYSHRL;

(e)      awarding Plaintiff monetary damages against Defendants DiFiore and Marks in their individual capacities as aiders and abettors to be determined at trial for the pain and suffering and reputational and professional harm she has suffered, pursuant to the NYSHRL;

(e)      awarding Plaintiff the costs of this action together with her reasonable attorneys' fees incurred in pursuing these claims, against Defendant Court System pursuant to the ADA and Rehab Act, and against Defendants DiFiore and Marks in their individual capacities as employers and aiders and abettors pursuant to the NYSHRL; and

(f)      granting such other and further relief to Plaintiff as this Court deems appropriate.

Dated:   October 23, 2018
         New York, New York

                                     CARY KANE LLP

                                     By: _____
                                         Anthony P. Consiglio
                                         Tara Jensen
                                         Larry Cary
                                  1350 Broadway, Suite 1400
                                  New York, NY 10018
                                  (212) 868-6300
                                  aconsiglio@carykane.com
                                  tjensen@carykane.com
                                  lcary@carykane.com
                                  *Attorneys for Plaintiff*